NO. 12-01-00117-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


JOHN DAVID BROWN,
§
 APPEAL FROM THE 337TH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 HARRIS COUNTY, TEXAS

 

 A jury convicted Appellant John David Brown of murder and assessed punishment at ninety-nine years in prison and a fine of $10,000.00. Appellant raises eight issues on appeal. We affirm. 
 

Background 

 In the early evening hours of August 15, 1999, Tony Gaston ("Tony"), who had graduated
from high school the previous May and was set to begin college at the University of Houston the
following week, went to meet someone who was selling a used car he was interested in buying. 
Tony was driving his father's dark blue Chevy pickup truck, and Tony's younger brother Justin
Gaston ("Justin") was along for the ride. After meeting with the seller of the used car in a parking
lot in Northshore in eastern Harris County, Tony decided to buy the vehicle and left to return home
to get a check for the purchase. After Tony pulled out of the parking lot, he made a U-turn on
Woodforest Boulevard and inadvertently cut off another automobile.

 The car stayed behind the truck for a short distance and then came around the truck on its
right side and got in front of it. The two vehicles continued to travel down Woodforest with the
truck directly behind the car for several minutes. During this time, Justin observed that the car was
a Mazda Protege and that there was a sticker on the bumper which read, "My child is an honor
student at Field Elementary." Justin could see the driver of the Protege looking in his rearview
mirror, waving his fingers and hands. 

 Soon the Protege moved into the left-hand lane. Tony continued in the same lane, and the
Protege fell back so that it was driving beside the truck. Three or four miles (1) from the place where
Tony had pulled out in front of the Protege, the two vehicles stopped side by side at a red light, with
the car on the left side of the truck. According to Justin, Tony looked at the two occupants of the
Protege but did not say anything to them or gesture to them in any way. Justin recounted that Tony
was not angry with the occupants of the Protege, but he told Justin the two guys were just being
"asses." 

 When the light turned green, the truck began to pull forward. Justin heard glass shatter and
assumed that someone had thrown a bottle at the truck. The truck continued forward a short distance
but left the roadway and, after running along an iron fence, crashed into the office building of an
apartment complex adjacent to Woodforest. The Protege sped away so hastily that Justin could
actually smell rubber burning as the tires spun against the pavement.

 After the truck came to rest, Justin observed that Tony was bleeding profusely and was
unresponsive. Tony, who had been shot in the left side of his face, died early the next morning in
a Houston hospital.

 That same morning, Justin met with a police sketch artist who composed a picture of the
passenger of the Protege from Justin's description. When the sketch and the description of the car
were released to the public, an acquaintance of Appellant's recognized the sketch as Appellant and
the car as one owned by Appellant's brother's girlfriend. Based on that individual's information,
along with Justin's description of the two occupants of the Protege, the police began an investigation
of Appellant and his brother, John Glenn Brown ("Glenn"). The brothers were subsequently charged
with Tony's murder. They were tried together, and both were convicted.


The Right to Self-Representation

 In his first issue, Appellant argues that the trial court erred by "ignoring" his request to
dismiss counsel and proceed pro se. 

 An accused has a constitutional right to represent himself in a criminal proceeding. Faretta
v. California, 422 U.S. 806, 836, 95 S. Ct. 2525, 2541, 45 L. Ed. 2d 562 (1975). However, this right
does not attach until it has been clearly and unequivocally asserted. Funderburg v. State, 717
S.W.2d 637, 642 (Tex. Crim. App. 1986). To preserve error on a trial court's failure to conduct a
hearing on a defendant's pro se motion to dismiss counsel, a defendant is required to request a
hearing. See Malcom v. State, 628 S.W.2d 790, 792 (Tex. Crim. App. [Panel Op.] 1982). The
record does not reflect that Appellant ever requested a hearing on his motions to dismiss counsel and
proceed pro se. Furthermore, our rules of appellate procedure provide that


 [a]s a prerequisite to presenting a complaint for appellate review, the record must show that the
complaint was made to the trial court by a timely request, objection, or motion that stated the grounds
for the ruling that the complaining party sought from the trial court with sufficient specificity to make
the trial court aware of the complaint, and the trial court ruled on the request, objection, or motion,
either expressly or implicitly or refused to rule on the request, objection, or motion, and the
complaining party objected to the refusal.



See Tex. R. App. P. 33.1 (emphasis added). Appellant argues that he was unable to request a ruling
on his motions because counsel waived his appearance at the severance hearing. However, the
record reflects that the severance hearing was continued to a second day and that Appellant was
present on the second day of the hearing but did not request a ruling or object to the trial court's
failure to rule at that time. Because the record does not reflect that Appellant requested a hearing
on his motions to dismiss counsel and proceed pro se, requested a ruling on his motions, or objected
to the trial court's failure to rule on the motions, Appellant has not preserved this issue for our
review. Accordingly, Appellant's first issue is overruled.


The Right to be Present 

 In his second issue, Appellant contends that the trial court erred by allowing trial counsel to
waive his appearance at a pre-trial hearing on his motion to sever.

 The presence of the defendant is required during any pre-trial proceeding. Tex. Code. Crim.
Proc. Ann. art. 28.01 § 1 (Vernon 1989). A hearing on a motion to sever, where evidence is offered
and argument is heard, is undoubtedly a "proceeding" at which the presence of the defendant is
required by the Code of Criminal Procedure. However, a defendant's right to be present may be
waived at such a hearing. See Tex. Code. Crim. Proc. Ann. art. 1.14(a) (Vernon Supp. 2002).

 Rather than considering the merits of Appellant's argument that trial counsel's waiver of his
presence at the hearing on the motion to sever was ineffective, we will assume Appellant's argument
is correct and proceed to a harm analysis of the trial court's error in conducting a pre-trial proceeding
in violation of a defendant's right to be present at that proceeding. Such error will be held harmless
unless the defendant's presence bore a reasonably substantial relationship to the opportunity to
defend. Adanandus v. State, 866 S.W.2d 210, 219-20 (Tex. Crim. App. 1993). 

 The hearing on Appellant's motion to sever was held over two days. Appellant was not
present the first day, but he was present the second day. Appellant avers that in his absence, the
State offered evidence relevant to severance and to a defense of which his counsel had no prior
knowledge and of which Appellant alone could have had knowledge: that Glenn was the shooter. 
Consequently, according to Appellant, his absence on the first day of the hearing rendered his
counsel unable to develop his defense. However, the matter of Glenn's being the shooter was not
developed on the second day of the severance hearing when Appellant was present or at any time
during the trial. Nowhere in the record of the trial is there any evidence that Glenn was the shooter. 

 Our review of the record reveals that on the first day of the hearing, counsel put on evidence
and made well-articulated and coherent arguments on Appellant's behalf. On the second day of the
hearing, when Appellant was present, the trial court gave the parties an opportunity to present further
evidence or argument. All declined. Therefore, we have no reason to speculate that this was a viable
defense or that Appellant's absence on the first day of a two-day hearing was the sole reason the
defense was not mounted. Because the record before us fails to show that Appellant actually had any
relevant information or knowledge which was not available to or possessed by his counsel on the
first day of the hearing, we cannot say that Appellant was harmed by the violation of his right to be
present. See Adanandus, 866 S.W.2d at 220; Muennink v. State, 933 S.W.2d 677, 684 (Tex. 
App.-San Antonio 1996, pet. ref'd). Appellant's second issue is overruled.


Severance and the Right to Confrontation In his third issue, Appellant contends that the trial court erred by refusing to grant his motion
to sever. In his fourth issue, Appellant argues that he was denied his constitutional right to confront
and cross-examine the witnesses against him. Appellant briefs these issues together.

 Two or more defendants who are jointly or separately indicted or complained against for the
same offense or any offense growing out of the same transaction may be, in the discretion of the
court, tried jointly or separately as to one or more defendants. Tex. Code Crim. Proc. Ann. art.
36.09 (Vernon 1981). In cases in which, upon timely motion to sever and evidence introduced
thereon, it is made known to the court that a joint trial would be prejudicial to any defendant, the
court shall order a severance as to the defendant whose joint trial would prejudice the other
defendant. Id.

 A trial court has considerable discretion in deciding whether a joint trial would be so
prejudicial to a particular defendant that a severance should be ordered. Hudson v. State, 794
S.W.2d 883, 885 (Tex. App.-Tyler 1990, no pet.). The defendant has the heavy burden of showing
clear prejudice resulting from the denial of a request for severance. Id. 

 Glenn did not testify at trial. Appellant claims he was prejudiced by the trial court's refusal
to sever his trial from Glenn's because hearsay statements made by Glenn, which incriminated
Appellant, were admitted into evidence. (2) Specifically, Appellant contends that because he could
not cross-examine Glenn, his right to confrontation was violated when hearsay statements made by
Glenn which implicated Appellant in the murder were introduced through the testimony of Deputy
Harold Moore, James Chaney, and Willie Cater. (3)

 In all criminal prosecutions, state as well as federal, the accused has a right, guaranteed by
the Sixth and Fourteenth Amendments to the United States Constitution "to be confronted with the
witnesses against him." U.S. Const. amend. VI.; Lilly v. Virginia, 527 U.S. 116, 123, 119 S. Ct.
1887, 1893, 144 L. Ed. 2d 117 (1999) (plurality opinion). The central purpose of the Confrontation
Clause is to ensure the reliability of the evidence against an accused through rigorous testing in an
adversary proceeding before the trier of fact. Maryland v. Craig, 497 U.S. 836, 845, 110 S. Ct.
3157, 3163, 111 L. Ed. 2d 666 (1990). Confrontation enhances the accuracy of the fact-finding
process because (1) a witness who testifies under oath will be impressed with the seriousness of the
matter and the possibility of a penalty for perjury; (2) cross-examination, which has been described
as "the greatest legal engine ever invented for the discovery of truth," is available for testing the
credibility of the witness; and (3) the demeanor of the witness can be considered by the jury in
assessing credibility. California v. Green, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935, 26 L. Ed. 2d
489 (1970) (citations omitted). 

 The rules of evidence also ensure that the evidence against an accused will be reliable, and,
under the rules of evidence, therefore, hearsay is generally not admissible. See Tex. R. Evid. 802;
Green, 399 U.S. at 155, 90 S.Ct. at 1933. Hearsay is a statement, other than one made by the
declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter
asserted. Tex. R. Evid. 801(d). There are a number of exceptions to the hearsay rule. See Tex. R.
Evid. 803, 804. When hearsay is admitted into evidence pursuant to an exception, an accused has
no opportunity to confront and cross-examine a declarant who does not testify, and in that instance,
the conflict between the hearsay rules and the guarantees of the Confrontation Clause must be
resolved. See Smith v. State, No. 12-99-00066-CR, slip op. at 6-7, 2002 WL 508348, at *4 (Tex.
App.-Tyler April 3, 2002, pet. filed ). If a hearsay statement is admissible under a "firmly rooted"
exception to the hearsay rule, reliability, for purposes of the Confrontation Clause, can be inferred. 
Idaho v. Wright, 497 U.S. 805, 816, 110 S. Ct. 3139, 3147, 111 L. Ed. 2d 638 (1990). If evidence
is admitted under a hearsay exception which cannot be considered "firmly rooted," the evidence is
presumed inadmissible and must be excluded, absent a showing of particularized guarantees of
trustworthiness. Id., 497 U.S. at 816-17, 110 S. Ct. at 3147.

 The trial court admitted Glenn's statements to Deputy Moore under Texas Rule of Evidence
803(24) as an exception to hearsay, and the State contends that Glenn's out of court statements to
the other witnesses were also admissible under the same rule. Rule 803(24) provides that a statement
against the declarant's penal interest may be admissible if corroborating circumstances clearly
indicate the statement's reliability. See Tex. R. Evid. 803(24). In order for a declaration against
interest to be admissible under Rule 803(24), the statement must be self-inculpatory with
corroborating circumstances to indicate the trustworthiness of the statements. See Dewberry v. State,
4 S.W.3d 735, 751 (Tex. Crim. App. 1999). An admission against the declarant's penal interest may
be admissible against a co-defendant so long as it is sufficiently against the declarant's own interest
to be reliable. See id.

 In Lilly v. Virginia, the Supreme Court of the United States distinguished a confession made
by an accomplice which inculpates a co-defendant from a statement against the declarant's own
interest alone and held that the former is not within a "firmly rooted" exception to the hearsay rule. 
See Lilly, 527 U.S. at 134, 119 S. Ct. at 1899. The Texas Court of Criminal Appeals has since held
that a statement against penal interest made to a friend or acquaintance which implicates the
declarant and the defendant equally is a firmly rooted exception to the hearsay rule. See Dewberry,
4 S.W.3d at 753. The court of criminal appeals revisited the issue in Guidry v. State, and held that
a statement against penal interest which shifts blame from the declarant to the defendant, is not
admissible under Rule 803(24). Guidry v. State, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999).

Glenn's Hearsay Statements

 Harris County Sheriff's Deputy Harold Moore testified that in the spring of 2000, he was
working as security officer for a group of inmates including Glenn. Deputy Moore overheard Glenn
discussing the murder with the other inmates and asked Glenn whether he had been involved in the
shooting. Glenn responded that he had been, and Deputy Moore told Glenn that Tony was his
godson. Later, Glenn told Deputy Moore that on the day of the murder, he was driving, and
Appellant was riding with him. Glenn said Tony cut him off, and then Appellant had a verbal
confrontation with Tony as the two vehicles continued to drive alongside one another for three or
four blocks. Glenn said that when he stopped at a red light, he leaned down to adjust the radio and
heard a gunshot. Glenn said he looked up to see that Appellant had shot Tony, and he sped away and
did not return. Glenn told Deputy Moore that he (Glenn) wanted to fight Tony, but he did not know
that Appellant was going to shoot Tony. Also, Glenn told Deputy Moore that he wanted to apologize
to Tony's parents, and Deputy Moore described Glenn's demeanor as "remorseful."

 James Chaney ("Chaney") testified that he was in the Harris County jail in October of 1999. 
Chaney heard Glenn talking about a murder and asked if it was the "Northshore murder." Glenn
responded affirmatively and then shared his concerns about the case against him and his brother with
Chaney. Glenn told Chaney that the weapon had not been recovered but that he had left a box of
bullets in the car. Glenn said the authorities did not have an accurate description of the car. Glenn
told Chaney that when he heard that a witness had seen an elementary school honor student sticker
on the car, he removed the sticker and washed the car. Chaney testified that Glenn "just wanted to
make sure that nobody could put anything on him." Glenn asked Chaney whether he knew if the fact
that a bullet hit glass before hitting the victim affected ballistics evidence, and he asked whether
Chaney believed that the authorities could prove the case against him. Glenn told Chaney that he
and Appellant had agreed not to talk to the police. Glenn told Chaney that he wanted to apologize
to Tony's family. Finally, Glenn told Chaney that he believed that "Willie" had "snitched" on him.

 Willie Cater ("Cater") testified that he saw Glenn in jail some time after the Brown brothers
were arrested for the murder. Glenn accused Cater of being a "snitch" but admitted to Cater that he
was driving when Appellant shot Tony. Glenn told Cater that he wanted to fight Tony but did not
know that Appellant was going to shoot Tony and asked Cater to stress that fact to the authorities.

Analysis: Glenn's Statements to Chaney

 Though he was asked several times, Chaney never testified that Glenn implicated Appellant
as the shooter. Because Glenn's statements to Chaney implicated both Glenn and Appellant equally,
they were sufficiently self-inculpatory of Glenn to be reliable. Dewberry, 4 S.W.3d at 753. We must
next determine whether the statements were sufficiently corroborated to indicate their
trustworthiness. We consider a number of factors including: (1) whether guilt of declarant is
inconsistent with guilt of the defendant, (2) whether declarant was so situated that he might have
committed the crime, (3) the timing of the declaration, (4) the spontaneity of the declaration, (5) the
relationship between the declarant and the party to whom the statement is made, and (6) the
existence of independent corroborative facts. Id. We note first that Glenn's guilt as a party is not
inconsistent with Appellant's guilt as the principal. We note that Glenn made the hearsay statements
in response to Chaney's casual inquiry after Chaney overheard Glenn talking about the murder with
his fellow inmates, and the setting in which the statements were made was apparently genial. These
factors tend to indicate the trustworthiness of the statements.

 Next, we look to the record for independent corroboration of Glenn's statements to Chaney.
Justin testified that the murder occurred in Northshore. Justin and Michelle Avalos, another witness,
testified that the Protege had a Field Elementary School honor student bumper sticker on it on the
day of the shooting, and Detective Allen Beall testified that when the Protege was found, the bumper
sticker had been removed. Several other things that Glenn told Chaney were corroborated by the
testimony of Detective Allen Beall: that a murder weapon was not recovered; that the bullet shattered
the window of the truck before striking Tony; and that the description that the authorities had of the
Protege was inaccurate. (4) That Glenn frequently drove the Protege was corroborated by the testimony
of Cater and Detective Beall. Finally, Cater himself confirmed that he had "snitched" on the Brown
brothers. 

 Considering this evidence along with the foregoing factors indicating the reliability of
Glenn's out of court statements to Chaney, we conclude that Glenn's statements to Chaney were
sufficiently reliable that they were admissible against Appellant under Rule 803(24). Consequently,
Glenn's statements to Chaney fell within a firmly rooted exception to the hearsay rule. Dewberry,
4 S.W.3d at 753. Therefore, reliability, for purposes of the Confrontation Clause, can be inferred. 
Wright, 497 U.S. at 816, 110 S. Ct. at 3147.

Analysis: Glenn's Statements to Deputy Moore and Cater

 Glenn's hearsay statements to Deputy Moore and Cater were not so equally against both
Glenn's and Appellant's interests as to reach the required level of reliability to be admissible under
Rule 803(24). Guidry, 9 S.W.3d at 149. Glenn did admit to Deputy Moore and Cater that he was
driving the car during the murder, but on the critical issue of who shot Tony, Glenn implicated
Appellant alone. Glenn told both Deputy Moore and Cater that he only wanted to fight Tony. 
Furthermore, Glenn told Deputy Moore that he was surprised when Appellant shot Tony and that he
wanted to apologize. "Granted both driver and triggerman bear potentially equal criminal liability,
but the driver might be in a better bargaining position should he decide to cooperate with the State,
and the driver might have a better chance at gaining sympathy from the jury." Id. Because Glenn's
statements to Deputy Moore and Cater so clearly delineate his and Appellant's roles on the critical
issue of who shot Tony, we hold that Glenn's statements to Deputy Moore and Cater which
implicated Appellant were not admissible under Rule 803(24). Id. 

 For the same reasons, Glenn's statements to Deputy Moore and Cater do not possess
sufficient inherent guarantees of trustworthiness to satisfy the Confrontation Clause. Where the
Confrontation Clause has been implicated, we conduct harm analysis under Rule 44.2(a) of the Texas
Rules of Appellate Procedure. Id. at 151. We must reverse the judgment of conviction unless we
determine beyond a reasonable doubt that the error did not contribute to the conviction or
punishment. Tex. R. App. Proc. 44.2(a). 

 Deputy Moore's and Cater's testimony as to Glenn's hearsay statements were only a small
part of the evidence against Appellant. Perhaps the strongest evidence against Appellant was
evidence that Appellant implicated himself as the shooter. Cater testified that after seeing news
reports about the murder, including a sketch of the passenger and a description of the Protege, he
deduced that Appellant and Glenn had committed the crime. When he saw Appellant, Cater jokingly
referred to him as "Killer," and Appellant thereafter described the offense in some detail to Cater. 
According to Cater, Appellant said he was riding with Glenn on Woodforest when they encountered
the truck. Appellant said the driver of the truck was "mad dogging" them and giving them
disparaging looks, so he told Glenn to "chase that fool." When the two vehicles came to a red light,
Glenn wanted to get out and fight with Tony. Appellant showed Glenn a 9 mm handgun and told
him, "No, you don't need to do it like that. I got this." As the traffic light turned green, Appellant
pointed the gun at the driver's side window of Tony's truck and shot right through the middle of it. 
Appellant told Cater he did not know whether he had shot Tony but thought he had. Appellant said
that after the shooting, Glenn "burned off." Cater testified that Appellant told him he melted the gun
after the shooting, and he also testified that he heard that "Henry" had the gun. 

 Henry Gates ("Gates") testified that around the first of September of 1999, Appellant gave
him a 9 mm Glock in exchange for fifty dollars in cash and some other item which Gates did not
identify. Gates told the jury that it was a loan transaction, and the agreement was that Appellant
could get the gun back for $200.00. Two weeks later, Appellant offered to give Gates $180.00 for
the gun, but Gates refused. Another time Appellant offered to trade a Ruger .357 for the Glock, but
again Gates refused. Later, on October 10, 1999, Appellant told Gates that there was "a body on the
gun,"meaning it had been used in a killing. Appellant asked if Gates had heard about the murder and
"hinted around" to Gates that he had done it. When Appellant got arrested, Gates threw the gun in
the San Jacinto River, and it was never recovered.

 There was direct testimonial evidence of Appellant's guilt. Justin identified Appellant as the
shooter in a line-up and in court. Maria Galindo, an eyewitness to the shooting, identified Appellant
in court as the man she saw stick his head out the window of the Protege toward Tony's truck before
she heard a loud boom and saw smoke. There was also circumstantial evidence linking Appellant
with the car through his brother. We conclude beyond a reasonable doubt, in light of the foregoing
evidence and in light of the fact that Glenn was also convicted, that admission of Glenn's hearsay
statements to Deputy Moore and Cater did not contribute to Appellant's conviction or punishment. 
Therefore, Appellant's fourth issue is overruled. 

 Likewise, Appellant's third issue is overruled. The prejudice which Appellant claims
resulted from the trial court's refusal to sever is that Glenn's hearsay statements which incriminated
Appellant were admitted into evidence, and Appellant could not cross-examine Glenn. Because we
found that any error in the admission of Glenn's hearsay statements against Appellant was harmless,
we cannot say that Appellant has met his burden of showing prejudice sufficient to require
severance. The trial court did not abuse its discretion by denying Appellant's motion for severance.


Prior Written Statements of Witnesses

 In his fifth issue, Appellant argues that the trial court erred by prohibiting him from cross-examining Justin on his prior written statements. 

 It appears from the record that the prosecutor asked the judge to prohibit Appellant from
seeing Justin's prior written statements under Rule of Evidence 612 because Justin testified that he
had not used the statements to refresh his memory. See Tex. R. Evid. 612. The statements should,
of course, have been made available to Appellant under Rule 615 and under the Gaskin rule. See
Gaskin v. State, 353 S.W.2d 467 (Tex. Crim. App. 1962) (op. on reh'g). However, Appellant
waived error on these grounds by failing to object to the trial court's ruling. See Tex. R. App. P.
33.1; Tex. R. Evid. 103(a). Therefore, Appellant's fifth issue is overruled.


Hearsay

 In his sixth issue, Appellant contends that the trial court erred by overruling a hearsay
objection to part of Detective Beall's testimony. When Detective Beall was asked whether Glenn's
girlfriend provided information to the police that was consistent with what Cater had told the police,
Glenn's counsel objected on the basis of hearsay. The objection was overruled. Appellant's counsel
did not object. 

 If a co-defendant does not voice his own objection at trial, he has not preserved error. See
Lerma v. State, 679 S.W.2d 488, 498 (Tex. Crim. App. [Panel Op.] 1982). A co-defendant may
adopt the objection of his fellow defendant, but that adoption must be reflected in the record. See
Woerner v. State, 576 S.W.2d 85, 86 (Tex. Crim. App. 1979). Appellant does not point out where,
if anywhere, in the record he adopted Glenn's objection. Therefore, Appellant has not preserved
error, if any. See Tex. R. App. P. 33.1. Accordingly, Appellant's sixth issue is overruled.

 

Proceeding with Eleven Jurors

 In his seventh issue, Appellant contends that the trial court erred by dismissing a juror during
the punishment phase of the trial over his objection. 

 Not less than twelve jurors can render and return a verdict in a felony case. Tex. Code Crim.
Proc. Ann. art. 36.29 (Vernon Supp. 2002). However, after the trial of any felony case begins and
a juror dies or, as determined by the judge, becomes disabled from sitting at any time before the
charge of the court is read to the jury, the remainder of the jury shall have the power to render the
verdict. Id. The determination as to whether a juror is disabled is within the discretion of the trial
court, and absent an abuse of that discretion, no reversible error will be found. Brooks v. State, 990
S.W.2d 278, 286 (Tex. Crim. App. 1999). However, the exercise of the trial court's discretion is
limited to situations where there exists some physical illness, mental condition, or emotional state
which hinders one's ability to perform one's duties as a juror. Landrum v. State, 788 S.W.2d 577,
579 (Tex. Crim. App. 1990).

 Before the trial resumed on the second day of the punishment phase, the trial judge stated for
the record that a juror's mother had suffered a heart attack the previous day. The juror had come to
the courthouse before trial was set to begin for the day and informed the judge that she needed to be
with her mother who was scheduled for surgery that morning. The judge detained the juror in the
jury room until he informed the parties that he intended to release the juror due to her disability. The
judge recounted the juror's mother's very critical condition and noted that the juror "just cannot
continue to serve [because] she must go and be with her mother." The judge said, "I now find that
it is impossible for [the juror] to continue serving as a juror." Appellant was afforded an opportunity
to question the juror before she was released but did not do so. Appellant's objection to proceeding
with eleven jurors was overruled, and the trial continued. 

 Because the court's charge on punishment had not been read to the jury, it was within the trial
judge's discretion to release the juror. Rojas v. State, 986 S.W.2d 241, 249 n. 7 (Tex. Crim. App. 
1998). The judge was in the best position to evaluate the juror's mental condition and emotional
state. Where Appellant declined to question the juror, and where the judge made detailed remarks
on the record recounting the juror's circumstances and his finding that the juror was disabled, we
cannot say that the trial judge abused his discretion by releasing the juror. Appellant's seventh issue
is overruled.


Ineffective Assistance of Counsel

 In his eighth issue, Appellant argues that he was denied effective assistance of counsel during
the punishment phase of the trial. Specifically, Appellant cites four instances where he believes his
trial counsel's performance was deficient: (1) where an officer testified that Appellant was a suspect
in a drive-by shooting, and counsel did not request a jury instruction on extraneous offenses; (2)
where a gang expert testified to statements made to him by Appellant while Appellant was in jail,
and counsel did not object; (3) where the same gang expert was allowed to testify about gang
violence without linking Appellant to that violence, and counsel did not object; and (4) where the
prosecutor argued for a life sentence, telling the jury that any other sentence would be "rol[ling] the
dice" with the parole board, and counsel did not object.

 The standard of review for ineffective assistance of counsel is enunciated in Strickland v.
Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The Strickland standard
applies to a determination of ineffective assistance of counsel in the punishment stage of trial as well
as at guilt-innocence. See Hernandez v. State, 988 S.W.2d 770, 771 (Tex. Crim. App. 1999). Under
the Strickland test, Appellant must show that (1) counsel's performance was deficient, and (2) but
for counsel's unprofessional errors, the result of the proceeding would have been different within
reasonable probability. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Tong v. State, 25 S.W.3d
707, 712 (Tex. Crim. App. 2000). A reasonable probability is a probability sufficient to undermine
confidence in the outcome of the proceedings. Tong, 25 S.W.3d at 712. Appellant is required to
establish his claims by a preponderance of the evidence. Id. Any allegation of ineffectiveness must
be firmly founded in the record, and the record must affirmatively demonstrate the alleged
ineffectiveness. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Failure to make
the required showing of either deficient performance or sufficient prejudice defeats an
ineffectiveness claim. Id. An appellate court looks to the totality of the representation and the
particular circumstances of each case in evaluating the effectiveness of counsel. Id. Our review of
counsel's representation is highly deferential. Tong, 25 S.W.3d at 712. We indulge a strong
presumption that counsel's conduct falls within a wide range of reasonably professional 
representation. Id. We will consider each of counsel's alleged errors separately.

The Jury Instruction on Extraneous Offenses

 Appellant contends that his trial counsel was ineffective for failure to request a jury
instruction that the State must prove extraneous offenses beyond a reasonable doubt after an
undercover narcotics agent testified that Appellant was a suspect in a drive-by shooting. (5) Article
37.07, section 3(a) and (b) of the Texas Code of Criminal Procedure requires the trial court to
instruct the jury at the punishment phase not to consider evidence of extraneous crimes or bad acts
unless it is shown beyond a reasonable doubt that the defendant committed them. See Tex. Code
Crim. Proc. Ann. art. 37.07, § 3(a) and (b) (Vernon Supp. 2002); Huizar v. State, 12 S.W.3d 479,
482-83 (Tex. Crim. App. 2000). In light of the fact that the State put on evidence of several
extraneous offenses at the punishment phase, we will assume, without deciding, that counsel's
performance was deficient for failure to request the jury instruction to which Appellant was entitled. 
Therefore, we must determine whether the result of the proceeding would have been different but
for counsel's error. 

 When the trial court fails to instruct the jury on the reasonable doubt standard for extraneous
offenses, we utilize the Almanza standard of review for jury charge error. Huizar, 12 S.W.3d at
484-85; Huizar v. State, 29 S.W.3d 249, 251 (Tex. App.-San Antonio 2000, pet. ref'd). Under
Almanza, we review jury charge error according to whether the error was preserved at trial. See
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Unpreserved jury
charge error does not require reversal unless it was so harmful that the defendant was denied a fair
and impartial trial and suffered actual egregious harm. See Huizar, 29 S.W.3d at 251. The degree
of harm must be evaluated "in light of the entire jury charge, the state of the evidence, including
contested issues and weight of probative evidence, the argument of counsel and any other relevant
information revealed by the record of the trial as a whole." Id. (quoting Almanza, 686 S.W.2d at
171).

 After reviewing the entire jury charge and the record of the trial as a whole, we do not believe
that Appellant was denied a fair and impartial trial or suffered actual egregious harm by the omission
of the jury instruction. Throughout both phases of the trial, Appellant's trial counsel thoroughly
examined witnesses, objected to evidence and vigorously argued on Appellant's behalf. The fact that
the jury assessed the maximum punishment cannot, by itself, show egregious harm. See Huizar, 29
S.W.3d at 251. Therefore, we cannot say that but for counsel's failure to request a jury instruction
on the reasonable doubt standard for extraneous offenses, the result of the trial would have been
different. See Id.

The Gang Expert

 Appellant contends that trial counsel was ineffective for failure to object to the admissibility
of oral statements made by him to Deputy Michael Squyres on the basis that the statements were
inadmissible under the Texas Code of Criminal Procedure. Article 38.22, section 3 of the Code of
Criminal Procedure prohibits the admission of unrecorded oral statements made by a defendant as
a result of custodial interrogation. See Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (Vernon Supp.
2002). Specifically, Appellant avers that trial counsel should have objected on the basis of Article
38.22 when the following colloquy occurred:


 Prosecutor: And, to your knowledge, is [Appellant] in a gang or has he been in a gang?

 Squyres: By his own admission and by the tattoos that he has on his body, I would say, yes.


 Prior to that exchange, Deputy Squyres testified that he was working in his capacity as an
officer of the Harris County Sheriff's Department's Disruptive Group Unit when he met two times
with Appellant in the Harris County jail. Deputy Squyres explained that whenever the employees in
the classification section of the jail come across an inmate who belongs to a particular gang or group,
they advise the Disruptive Group Unit. Then someone from the Disruptive Group Unit will talk to
the inmate individually to find out if the inmate is a member of a gang. Deputy Squyres told the jury
that the main purpose of his unit is "to identify and to assist the people that belong to different
disruptive groups, gangs." He explained that the purpose of this inquiry is to determine if the inmate
needs special housing. The Deputy testified, "Our main concern is care, custody and control of the
inmates within the jail." 

 The prohibitions of Article 38.22 do not apply to oral statements which are not the result of
custodial interrogation. "Even express questioning is not interrogation if it is normally attendant to
the legitimate processing of a suspect." 41 George E. Dix & Robert O. Dawson, Texas
Practice: Criminal Practice and Procedure § 13.25 at 31 (2d ed. 2001). Nowhere in the record
before us does it appear that Deputy Squyres interrogated Appellant about the crime with which he
was charged. We hold that Appellant's answers to questions which served the legitimate purposes
of care, control, and appropriate housing of inmates in the Harris County jail were not the result of
custodial interrogation, and, thus, were not admitted as evidence in violation of Article 38.22. Cf. 
Cruse v. State, 882 S.W.2d 50, 51-52 (Tex. App.-Houston [14th Dist.] 1994, no pet.)(interview by
pretrial services department employee to obtain information on which pretrial release decisions
would be made did not implicate the Fifth or Sixth Amendments to the Constitution of the United
States); Mayes v. State, 870 S.W.2d 695, 698 (Tex. App.-Beaumont 1994, no pet.)(question
regarding employment status asked during routine booking procedures at county jail did not
constitute custodial interrogation). 

 In order to successfully argue on appeal that trial counsel's failure to object to certain
evidence constituted deficient performance, Appellant must show that the trial judge would have
committed error in overruling such an objection. See Vaughn v. State, 931 S.W.2d 564, 566 (Tex.
Crim. App. 1996). Because the trial court would not have erred by overruling an objection, based
on Article 38.22, to the admissibility of Deputy Squyres' testimony that Appellant was a member
of a gang, counsel's failure to make such an objection did not amount to deficient representation.

 Appellant also contends that trial counsel was ineffective for failure to object to Deputy
Squyres' testimony about gang violence because it did not comply with the requirements for
admission of such evidence. Evidence of Appellant's membership in a gang is relevant and
admissible as it relates to his character where it is shown that the gang engaged in violent and
criminal behavior such that a rational jury could conclude that the gang's reputation is bad. See
Beasley v. State, 902 S.W.2d 452, 456 (Tex. Crim. App. 1995). It is not necessary to link the
accused to the bad acts or misconduct generally engaged in by gang members, so long as the jury is
(1) provided with evidence of the defendant's gang membership, (2) provided with evidence of
character and reputation of the gang, (3) not required to determine if the defendant committed the
bad acts or misconduct and (4) only asked to consider reputation or character of the accused. Id. at
457. Our review of the record reveals that Deputy Squyres' testimony provided evidence of
Appellant's gang membership in more than one gang by an analysis of Appellant's many tattoos;
provided evidence of the bad reputation of both gangs; did not suggest that Appellant committed any
of the bad acts or misconduct ascribed to the gangs; and was geared specifically, by the prosecutor's
questions, to the ultimate issue of Appellant's character and reputation as a peaceful and law-abiding
person. Again, because the trial court would not have erred had it overruled an objection to the gang
violence testimony, trial counsel was not deficient for failure to make such an objection. See
Vaughn, 931 S.W.2d at 566. 

The Prosecutor's Final Argument

 Appellant contends that trial counsel was ineffective for failure to object to the prosecutor's
impermissible final argument which asked the jury to consider parole law in assessing Appellant's
sentence. 

 The prosecutor's reference to parole law came near the end of his argument. He said:



 And how in anybody's right mind could you ever not give these guys life?


 That's 30, that's 30, before they're eligible for parole. Okay. 


 No guarantee they're going to stay locked up. They got to do 30 flat, and they're eligible for parole. 
Then they come before a parole board, who will ask them questions, like, did you pay your debt to
society? Are you, like rehabilitated and stuff?


 Where a parole board will role [sic] the dice, gamble, and pray to keep their fingers crossed that we
don't have to have another Anthony Gaston. That's what the parole board would do.



 Proper jury argument must fall into one of four general categories: (1) summation of the
evidence; (2) reasonable deduction from the evidence; (3) response to argument of opposing counsel;
and (4) plea for law enforcement. See Guidry, 9 S.W.3d at 154. The prosecutor's argument for a life
sentence was in direct response to counsel's argument against a life sentence. A plea that a
defendant be given a long sentence so that he will not soon be released on parole is a proper plea for
law enforcement at the punishment phase of trial. See Damian v. State, 881 S.W.2d 102, 115-16
(Tex. App.-Houston [1st Dist.] 1994, pet. ref'd). An attorney for the State may explain or
summarize the law included in the court's charge. See Helleson v. State, 5 S.W.3d 393, 397 (Tex.
App.-Fort Worth 1999, pet. ref'd). However, a prosecutor must avoid applying the parole law 
specifically to the defendant on trial. See Taylor v. State, 911 S.W.2d 906, 911 (Tex. App.-Fort
Worth 1995, pet. ref'd). In this case, the prosecutor's arguments "[t]hat's 30 before they're eligible
for parole" and "[t]hey got to do 30 flat, and they're eligible for parole" applied specifically to
Appellant (and Glenn). We hold that this portion of the prosecutor's argument, applying the parole
formula specifically to Appellant, was improper. See Perez v. State, 994 S.W.2d 233, 237 (Tex.
App.-Waco 1999, no pet.). Furthermore, the prosecutor's arguments that the parole board would
"role [sic] the dice, gamble, and pray to keep their fingers crossed that we don't have another
Anthony Gaston" came close to crossing the line of impermissible argument by implicitly urging the
jury to consider application of the parole law when assessing Appellant's sentence. 

 Trial counsel's performance was deficient for failure to object to the prosecutor's argument
applying the parole formula specifically to Appellant. Therefore, we must next determine whether
the outcome of the proceeding would have been different but for counsel's error. But cf. Valencia
v. State, 966 S.W.2d 188, 191 (Tex. App.-Houston [1st Dist.] 1998, pet. ref'd)(holding that
counsel's failure to object to prosecutor's argument, which invited consideration of parole law and
supplied an erroneous formula for calculating parole eligibility, amounted to ineffective assistance
of counsel as a matter of law). 

 Improper jury argument is error of nonconstitutional dimension. Martinez v. State, 17
S.W.3d 677, 692 (Tex. Crim. App. 2000). A nonconstitutional error which does not affect
substantial rights must be disregarded. See Tex. R. App. P. 44.2(b). "A criminal conviction should
not be overturned for non-constitutional error if the appellate court, after examining the record as
whole, has fair assurance that the error did not influence the jury, or had but a slight effect." 
Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Determining harm under the
standard for nonconstitutional error in improper argument cases requires balancing the following
three factors: (1) the severity of the misconduct and its prejudicial effect, (2) curative measures, and
(3) the certainty that the punishment assessed would be the same absent the misconduct. See
Martinez, 17 S.W.3d at 692-693. 

 Because the impermissible arguments constituted only a small part of the prosecutor's
argument as a whole, the severity of the misconduct was mild. We note that because there was
neither an objection to the prosecutor's argument nor a request for an instruction to disregard, there
were no curative measures taken by the trial court. Furthermore, the court specifically instructed the
jury that although the jury charge advised them of the operation and effect of parole law, the jury was
not to consider the manner in which the parole law might be applied to Appellant. We presume the
jury followed the court's instruction in the absence of evidence to the contrary. See Hutch v. State,
922 S.W.2d 166, 170 (Tex. Crim. App. 1996). 

 We next consider whether the punishment assessed would have been the same absent the
misconduct. When analyzing whether a nonconstitutional error caused harm requiring reversal, we
must review the entire record to determine whether the error substantially influenced the verdict. 
McGowen v. State, 25 S.W.3d 741, 745 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd); Rudd
v. State, 921 S.W.2d 370, 372 (Tex. App.-Texarkana 1996, pet. ref'd). Overwhelming evidence of
the defendant's guilt is a variable that we may consider in determining whether improper
prosecutorial jury argument is harmless. Rudd, 921 S.W.2d at 372. The evidence against Appellant,
as recounted above, was overwhelming, and the nature of the offense was truly senseless. Perhaps
most importantly to our determination, the prosecutor did not distinguish between Appellant and
Glenn in his argument. The prosecutor argued for a life sentence for "these guys," and the jury
sentenced Glenn, an habitual offender, to thirty-five years. It would be illogical for us to conclude
that the jury disregarded the improper argument and abided by the court's instructions when
assessing Glenn's sentence but was unable to do so when assessing Appellant's sentence. Therefore,
we conclude that the prosecutor's improper argument had no effect on the punishment assessed. 
Accordingly, Appellant's eighth issue is overruled. 

 The judgment of the trial court is affirmed.


 SAM GRIFFITH 

 Justice


Opinion delivered June 18, 2002.

Panel consisted of Worthen, J., and Griffith, J.































(DO NOT PUBLISH)
1. Justin estimated the distance to be three or four miles, but the actual distance is unclear from the record.
2. Appellant recites in his statement of facts pertinent to this issue that he based his pretrial motion for
severance on antagonistic defenses. However, Appellant's brief does not "contain a clear and concise argument for
the contentions made, with appropriate citations to authorities" for this proposition. Tex. R. App. P. 38.1(h). 
Therefore, we do not address this ground for severance.
3. Appellant also alleges hearsay in the prosecutor's opening statement. However, Appellant has not
presented this issue for our review by appropriate argument and authorities. Tex. R. App. P. 38.1(h). 
4. Justin had told the police that the car involved in the shooting was dark green, but Glenn's girlfriend's
Mazda Protege was black. 
5. The State suggests that the drive-by shooting to which the officer referred was the murder of Tony-the
charged offense. However, because this is not clear from the record, we cannot so assume.